# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JUDITH MYERS,             *

          *

      Plaintiff,      *

          *

v.                *      Civil No. **PJM 18-1934**

          *

TOWN OF COLMAR MANOR *et al.*,    *

          *

      Defendants.    *

## MEMORANDUM OPINION

Judith Myers started working for the Town of Colmar Manor, Maryland, in 2001, first as a temporary employee, then as a full-time administrative assistant and, beginning in 2009, as the Office Manager. In the latter capacity Myers supervised the performance of the Town's approximately ten full- and part-time staff, prepared and submitted grant proposals, and handled event logistics on behalf of the Town's Mayor. *See* ECF Nos. 39-4 and 39-14. During her tenure with the Town, Myers received largely positive performance reviews. *See* ECF No. 45-2.

In 2014, Sadara Barrow was elected Mayor of the Town. Although Barrow did not directly supervise Myers – that was the responsibility of the Town's Clerk-Treasurer – Barrow, as Mayor, was ultimately responsible for the entire staff of the Town, including Myers.[1] By most accounts, Barrow and Myers did not get along. *See generally* ECF No. 45-8. Both before and after Barrow's election, Myers openly questioned whether Barrow was qualified to be Mayor. *See* ECF No. 45-6, pp. 75-76. For her part, Barrow accused Myers of intentionally failing to secure event tickets or to make hotel reservations for her and of excluding her from at least one staff meeting. *See* ECF

---

[1] *See* ECF No. 11-2, Charter of the Town of Colmar Manor, Article III § 309(6) ("The Mayor shall… supervise and direct all official activities of the department heads and employees of the Town").

No. 45-8. In 2017, more generally, Barrow accused Myers of using her position as Office Manager to impede Barrow's efforts to implement her vision for the Town. *See* ECF No. 39-11. Accordingly, on May 19, 2017, at Barrow's direction, the Clerk-Treasurer presented Myers with a letter terminating her employment. *Id.*

Nearly a year later, on March 20, 2018, the Town held a hearing to discuss Town Ordinance 02-2018, which would increase the Mayor's salary by $25,000 annually.[2] In what comprises the heart of Myers's claim, she submits that Barrow defamed her twice during that meeting. The Court focuses on that event.[3]

Barrow began the meeting by asking for a motion to open a "public hearing on [the] incoming Mayor's salary."[4] Town of Colmar Manor, *Town of Colmar Manor Public Hearing – March 20, 2018*, YouTube (Mar. 21, 2018), https://youtu.be/Bmhp5C_ZSOY (at 0:00:09 seconds into the recording) (hereinafter "YouTube").[5] She sat at a table at the front of the room, flanked by four Councilmembers. All were wearing the same dark red blazers and were identified by nameplates. *See id.* at 0:06:39. In a scenario familiar to municipalities across the country, the officials sat facing unidentified citizens sitting in rows of chairs facing the officials. *Id.* After explaining the details of the proposed ordinance, including the feature that, if enacted, "the Mayor shall be paid [an additional annual stipend] so long as the Mayor performs the services of a town

---

[2] The salary increase would not go into effect until the next mayoral term; that is, Barrow would not reap the benefit unless she was reelected. *See* ECF No. 11-2, Charter of the Town of Colmar Manor, Article III § 304 ("The Mayor and each Councilmember shall receive an annual salary to be paid monthly as set from time to time by ordinance passed by the Town Council in the regular course of business... The salary specified at the time the Mayor and any Councilmember takes office shall not be changed during the term for which that Mayor or member was elected").

[3] Myers also asserted claims of race and age discrimination, *see* ECF No. 18, which the Court addressed and ruled upon at oral argument and in its Order dated October 22, 2019. *See* ECF No. 54.

[4] Town officials use the words "meeting" and "hearing" interchangeably. *Compare* YouTube at 0:00:10 *with* YouTube at 0:00:14 ("We are opening up a public *hearing* on [the] incoming Mayor's salary. Is there a motion to open the *meeting*?... This *meeting* is now in order"). The Court sees no distinction between the two words in the context of this case.

[5] A video recording was made of the entire proceeding and provides the basis for the factual findings that follow.

administrator," *id.* at 0:03:53, the Town's leaders entertained a series of questions and comments

from constituents, beginning with a "vehement protest" of the proposed ordinance by a former

Mayor, *id.* at 0:14:50.

Over an hour into the hearing, an attendee identified as Ms. Lee asked Mayor Barrow:

"What was the reason that we let go of our administrative person?" Barrow, in what appears to

have been a reserved tone, responded: "Competence... Incompetence." *Id.* at 1:07:07). Then,

approximately a half hour later, when an unidentified male attendee asked Barrow about the

procedures for alerting the Town to maintenance issues, Barrow, after describing the Town's

online work order system and noting the challenges she faced modernizing the Town, stated:

> I want to say that when I first came in here as Mayor – and for any employee that
> is still here, know that they are still here because they have made some
> improvement – but this place was like the inmates running the asylum. There was
> no – no one was oversight [sic] to anything that was happening here... It was a very
> very frustrating scenario here. I try not to be unkind, but the previous administration
> did not look into what was happening from an administrative point in this Town.

*Id.* at 1:39:42.

Although Barrow did not mention Myers by name, there is no question that her comments

referred, at least in part, to Myers. *See* ECF No. 45-8, p. 27.

Barrow was deeply offended by Barrow's remarks and claims that, since the hearing, she

has been unable to find employment with nearby municipalities and that residents of Colmar

Manor "clam up" when they see her. ECF No. 46-2, p. 92.

The matter is before the Court on Defendants' Motion for Summary Judgment, ECF No.

39. Following oral argument, the Court, on the record, granted Defendants' Motion as it pertained

to Myers's claims of race discrimination in violation of Title VII of the Civil Rights Act of 1964,

as amended, 42 U.S.C. § 2000, *et seq.,* and age discrimination in violation of the Age

Discrimination in Employment Act, 29 U.S.C. § 63a. *See* ECF No. 54. Only Myers's claim for defamation remains. *Id.*

For the reasons that follow, the Court **GRANTS** Defendants' Motion for Summary Judgment, ECF No. 39, as it pertains to Myers's defamation claim.[6]

## I.   STANDARD OF REVIEW

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56(a), the Court will grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, the court draws all justifiable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48.

### B.  Defamation

The meaning of "defamation" in law differs from the manner in which the term is used in common parlance. Indeed, "[n]ot every statement that casts an unfavorable or unappealing light… constitutes an actionable claim of defamation." *Shulman v. Rosenberg*, Case No. 24-C-16-001867, 2017 WL 5172642 * 11 (Md. Ct. Spec. App. 2017). In the legal sense, a defamatory statement is

---

[6] The claim is made both against Barrow individually and the Town of Colmar Manor as her employer. The challenged words, however, were spoken by Barrow alone and there is no suggestion that the Town did anything actionable apart from being Barrow's employer. Therefore, insofar as the Court finds in Barrow's favor, it must also find in favor of the Town.

one that "tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." *Gohari v. Darvish*, 767 A.2d 321, 327 (Md. 2001). To establish a claim of defamation in Maryland "a plaintiff must establish four elements: (1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Offen v. Brenner*, 935 A.2d 719, 723-24 (Md. 2007) (*citing Smith v. Danielczyk*, 928 A.2d 795, 805 (Md. 2007)); *see also Baltimore Sports & Social Club, Inc. v. Sport & Social, LLC*, 228 F. Supp. 3d 544, 549-50 (D. Md. 2017).

### i.

In Maryland, as in most jurisdictions, a defendant may in certain situations assert privilege as a defense to a defamation action. *See Hosmane v. Seley-Radtke*, 132 A.3d 348, 356 (Md. Ct. Spec. App. 2016). Privileges pertain to circumstances where the defendant "is acting in furtherance of some interest of social importance" deemed to outweigh a plaintiff's reputational interest. *Gohari*, 767 A.2d at 328 (*quoting* Prosser and Keeton on Torts § 114, 815 (5th ed. 1984)); *Seley-Radtke v. Hosmane*, 149 A.3d 573, 575 (Md. 2016). For example, a privilege may apply to statements made between people who are part of a common enterprise, such as a manager's assessment of an employee, *see id.* at 329-30, or they may extend to one's opinion of matters of public interest, including the description of crime within the community, *see Shulman* at * 15.

There are two general categories of privilege: absolute and conditional (the latter sometimes referred to as qualified privilege). *Gohari*, 767 A.2d at 327-28; *see also Offen,* 935 A.2d at 724 ("Depending upon the circumstances, a defendant in a defamation suit may assert a conditional or absolute privilege"). An absolute privilege provides complete immunity "regardless

of the purpose or motive of the defendant, or the reasonableness of his conduct." *Gohari*, 767 A.2d at 327, n.13 (*citing Di Blasio v. Kolodner*, 197 A.2d 245, 250 (Md. 1964)); *see also Mandel v. O'Hara*, 576 A.2d 766 (Md. 1990) ("An absolute immunity from tort liability 'stands even if the official acts in bad faith, or with malice or corrupt motives'") (*quoting* Prosser & Keeton, § 132, at 1057 (5th ed. 1984)). Conditional immunity, as the term suggests, applies only if certain other criteria are met – most notably that the statement was made without malice towards the subject. *See id.*; *Mandel*, 576 A.2d at 766 ("Qualified immunity is usually destroyed by malice, bad faith or improper purpose") (*citing* Prosser & Keeton, § 132, at 1059-60) (cleaned up)); *see also* Dan B. Dobbs, The Law of Torts, §§ 413–414 (2000).

**ii.**

Where a defendant asserts privilege in a motion for summary judgment in a defamation action, the court first considers whether the asserted privilege applies. *Piscatelli v. Van Smith*, 35 A.3d 1140, 1147 (Md. 2012); *accord Lindenmuth v. McCreer*, 165 A.3d 544 (Md. Ct. Spec. App. 2017). The Court "assume[s] that the plaintiff's allegations of defamation are true for purposes of evaluating whether the privilege exists." *Id.* The Court then determines whether the privilege applies.

## C. Legislative Immunity

Barrow asserts that her statements are protected by privileges conferred upon government officials acting the course of official business. The allegedly defamatory statements, she claims, are privileged speech protected by "legislative immunity." She puts forth two distinct sources of legislative immunity: first, absolute legislative immunity derived from the common law, and second, the absolute statutory immunity afforded certain public officials pursuant to Maryland

Courts and Judicial Proceedings ("CJ") Article § 5-501.[7] These two sources, as will be seen, overlap.

Courts have traced the origin of legislative immunity for defamatory statements to England in the Sixteenth and Seventeenth Centuries. *Tenney v. Brandhove*, 341 U.A. 367, 372 (1951). "The principle that legislators are absolutely immune from liability for their legislative activities has long been recognized in Anglo-American law" and "was taken as a matter of course by those who... founded our Nation." *Id.* As a Founding Father and drafter of the Constitution, James Wilson, explained:

> In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offense.

*Id.* (*quoting* II Works of James Wilson (Andrews ed. 1896) 38); *see also United States v. Brewster*, 408 U.S. 501, 507 (1972) (the immunities were included in the Constitution "to protect the integrity of the legislative process by insuring the independence of individual legislators").

The drafters of the Federal Constitution and the Constitutions of many of the newly independent States, including Maryland, "protected legislators from liability for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44 (1998); *see also* U.S. Const., Art. I, § 6 ("... for any speech or debate in either House, [Senators and Representatives] shall not be questioned in any other place"). Thus, Article 10 of the Maryland Declaration of Rights provides "[t]hat freedom of speech and debate, or proceedings in the Legislature, ought not to be impeached in any Court

---

[7] *See Mandel*, 576 A.2d at 781 (describing legislative privilege in Maryland as "absolute"). Barrow also asserts that the conditional common law privileges arising out of the employer-employee relationship, *see Gohari*, 767 A.2d at 328-333, and the negligent acts of public officials during the course of their discretionary tasks, *see Houghton v. Forrest*, 989 A.2d 223, 227-28 (Md. 2010), also apply. Because the matter can be resolved on the basis of legislative privilege alone, the Court need not address these conditional immunities.

of Judicature" and Article III, Section 18 of the Maryland Constitution sets out that "[n]o Senator or Delegate shall be liable in any civil action, or criminal prosecution, whatever, for words spoken in debate." Md. Const., Declaration of Rights, art. 10; Md. Const. art. III, § 18; *see also Blondes v. State*, 294 A.2d 661, 662 (Md. Ct. Spec. App. 1972).[8]

Notably, local legislators "are not *directly* within the ambit of either the State or Federal Constitutional immunity provisions, which apply only to the members of legislative bodies mentioned within them." *Montgomery County v. Schooley*, 627 A.2d 69, 73 (Md. Ct. Spec. App. 1993) (emphasis added). However, over time "[t]he doctrine articulated in those provisions has... been regarded as applicable to members of local and regional legislative bodies... as a matter of common law." *Id.*; *see also Kensington Volunteer Fire Dept., Inc. v. Montgomery County*, 684 F.3d 462, 470 (2012) (applying legislative immunity to county government). In the 1930s, the First Restatement of Torts indicated that the immunity conferred to "a member of the Congress of the United States or of the legislature of any State or Territory," noting specifically that it *did not* extend to "subordinate legislative bodies to which the State has delegated legislative power." Restatement (First) of Torts § 590 (1938); *id.* cmt. c. But, the Second Restatement of Torts, published in 1977, explains that by that time the majority of jurisdictions had held that legislative immunity *was* "applicable to members of subordinate legislative bodies to which the State has delegated legislative power, such as a city council or a county board."[9] Restatement (Second) of

---

[8] Maryland courts have held that, "[i]n view of their common derivation and purpose," "the legislative privilege afforded under the dual provisions in the organic law of the State should be construed *in pari materia* with Article I, Section 6 of the federal Constitution." *Blondes*, 294 A.2d at 666; *State v. Holton*, 997 A.2d at 835.

[9] The Restatement (Second) of Torts states: "A member of the Congress of the United States or of a State *or local legislative body* is absolutely privileged to publish defamatory matter concerning another in the performance of his legislative functions." Restatement (Second) of Torts § 590 (1977) (emphasis added). Restatement (Second) goes on to say that "[u]nder a minority rule, the absolute privilege is held not to be applicable to these [local] legislative members, who may be entitled instead to the conditional privilege." *Id.*, cmt. c.

Torts § 590 (1977), cmt. c; *see also Sanchez v. Coxon*, 854 P.2d 126, 128-29 (Ariz. 1993) (en

banc). The Maryland Court of Appeals explained the policy reasons for this shift:

> Local legislators constitute the most direct form of representative democracy. They
> are the closest to the People and they often set the policies that most directly affect
> the health, safety and quality of life of the people residing in their communities.
> They must enjoy the same ability to speak and act in their legislative capacities,
> without fear of retribution, either criminally or civilly, because of what they say or
> how they vote. They may be called upon to answer for their legislative conduct to
> the citizens who elected them, which is what democracy is all about, but they may
> not be compelled to defend their legislative conduct to a prosecutor, to a grand jury
> or to a court.

*State v. Holton*, 24 A.3d 678, 683 (Md. 2011) (*quoting State v. Holton*, 997 A.2d 828, 856 (Md.

Ct. Spec. App. 2010)). Directly on point, the Maryland Court of Special Appeals has held that

"federal and local [legislative] privileges are essentially co-extensive." *Manders v. Brown*, 643

A.2d 931, 937 (Md. Ct. Spec. App.  1994) (*citing Schooley*, 627 A.2d at 74), *accord Floyd v.*

*Baltimore City Council*, 209 A.3d 766, 772 (2019) ("While federal and state constitutional

immunity provisions expressly refer to the Congress and the General Assembly, respectively, the

doctrine of legislative privilege extends to local and municipal legislators as a matter of common

law"). So much for common law legislative immunity.

Underlining the importance of local legislators' unfettered discourse – and clearly

articulating the breadth of the privilege[10] – the Maryland General Assembly enacted what is now

---

[10] In the years preceding 1973, a series of Supreme Court cases grappled with the scope of legislative privilege, especially when concerning a defendant's alleged criminal activity. *See United States v. Dowdy*, 479 F.2d 213, 221 (4th Cir. 1973) (discussing *United States v. Brewster*, 408 U.S. 501 (1972) and *Gravel v. United States*, 408 U.S. 606 (1972)). Some commentators at the time advocated for the passage of a statute to define the scope of legislative privilege. Robert J. Reinstein & Harvey A. Silverglate, *Legislative Privilege and The Separation of Powers*, 86 Harv. L. Rev. 1113, 1179 (1973).

CJ § 5-501. *See* 1973 Md. Laws, ch. 287; *see also State v. Holton*, 24 A.3d at 682.[11] The statute,

entitled "Action for defamation against local government official,"[12] states in its entirety:

> A civil or criminal action may not be brought against a city or town councilman, county commissioner, county councilman, or similar official by whatever name known, for words spoken at a meeting of the council or board of commissioners or at a meeting of a committee or subcommittee thereof.

Md. Code Ann., Cts. & Jud. Proc. § 5-501.

The language of CJ § 5-501 is concise and unambiguous. It provides broad protection. The

phrase "for words spoken," the Court of Appeals has explained, "was lifted directly from Article

III, Section 18 of the Maryland Constitution." *State v. Holton*, 24 A.3d at 682. Because of the

parallel verbiage, the statute must, therefore, "be construed as... provid[ing] the same level and

scope of protection to the local legislators as is enjoyed by members of the General Assembly."

*Id.* In sum, the protections of Constitutional and common law legislative immunity are "embodied

in CJ § 5-501." *State v. Holton*, 997 A.2d at 834, *aff'd*, 24 A.3d 678 (Md. 2011).

Indeed, when interpreting the scope of CJ § 5-501, courts have been instructed to examine

as persuasive authority judicial precedent pertaining to legislative immunity, regardless of the

source. *See Mandel*, 576 A.2d at 771 (holding judicial decisions concerning 42 U.S.C. § 1983 and

*Bivens* claims "may be persuasive authority as to the Maryland common law of public official

immunity in a state law").

---

[11] Shortly after the bill's passage, the General Assembly revised the entire Maryland Code, during which the relevant "sections added to Articles 23A, 25, 25A and 25B just months earlier were consolidated and re-styled as [CJ §] 5-304." *State v. Holton*, 24 A.3d 678, 683 (Md. 2011). In 1977, this section was moved to its current location, CJ Article § 5-501, without any substantive changes. *Id.*

[12] Although the caption of CJ § 5-501 specifically refers to "Action[s] for defamation," the content of the statute appears to go beyond just defamation, e.g., a criminal prosecution. The Maryland Court of Appeals has cautioned that "[i]n determining the meaning of a statute, we look to the words of the statute itself, not a caption." *State v. Holton*, 24 A.3d 678, 683 (Md. 2011) (*quoting State v. Holton*, 997 A.2d 828, 853 (Md. Ct. Spec. App. 2010) (interpreting CJ § 5-501)).

## II.    ANALYSIS

Against this background, the Court considers Barrow's Motion for Summary Judgment. She contends that CJ § 5-501 and the common law immunize her statements about Myers at the March 20, 2018 meeting of the Town Council.

Myers puts forward a series of arguments for why the immunities should not apply. First, she submits that the meeting was not a "meeting" as encompassed by CJ § 5-501. Second, she says that Barrow, as Mayor and therefore as an executive official, cannot be covered by *legislative* immunity. Third, she argues that even if the meeting and Barrow were generally protected by immunity, the specific statements Barrow made about Myers fall outside the scope of those privileges. The Court considers these arguments.

### A. Does the March 20, 2018 meeting constitute a "meeting" pursuant to § 5-501?

Myers argues that the March 20, 2018 meeting does not qualify as a "meeting" pursuant to the statute because it was not one of the Town's regularly scheduled monthly council meetings and no vote took place at the meeting. The Court disagrees.

The Town Charter does not meaningfully distinguish among and between different types of meetings. Section 305(d) of the Charter states that "[t]he Mayor... shall call Town Council meetings from time to time as deemed necessary," treating them no differently than so-called "regular" meetings held pursuant to § 305(a) that occur "in some convenient place in the Town not less than once in every month." ECF No. 11-2, Charter of the Town of Colmar Manor ("Charter"), Article III § 305. Moreover, the Charter clearly envisions meetings at which no vote takes place, stating that a vote *could* occur at either a regular or "special" meeting. *Id.* at § 307. Myers's claim that no "meeting" occurred on March 20, 2018 is squarely at odds with this.

Nor does CJ § 5-501 distinguish among and between meetings based upon their scheduling or content. Immunity is conferred so long as the meeting at issue is "a meeting of the council or board of commissioners." Md. Code Ann., Cts. & Jud. Proc. § 5-501; *see also State v. Holton*, 24 A.3d at 684 ("we conclude that the General Assembly meant what it said" in CJ § 5-501). Indeed, legislative history supports the notion that the General Assembly did not intend to limit CJ § 5-501 only to certain meetings of a Town Council. In 1976, just three years after the enactment of the statute, the General Assembly expanded the original language to expressly include not just full meetings of a council or board, but also meetings of "a committee or subcommittee thereof." 1976 Md. Laws, Ch. 355; *see also State v. Holton*, 420 Md. at 539. The General Assembly's broadening of the statute further refutes Myers' argument that "meeting" is a narrowly defined term.

Nor does Myers' assertion find solace at common law. *See Schooley*, 627 A.2d at 78 ("It is evident... that the legislative process, for purposes of the privilege, includes more than just proceedings at regularly scheduled meetings of a legislative body..."); Restatement (Second) of Torts § 590 (1977), cmt. a ("The [absolute legislative] privilege [to publish defamatory matter] is not confined to conduct on the floor of the legislative body. It extends to the work of legislative committees or sub-committees that are engaged in an investigation or other work authorized by the legislative body, whether the work is performed while that body is in session or during a recess.").

In sum, there is no support for the argument that the March 20, 2018 meeting is excluded from the protection conferred by CJ § 5-501.

### B. Does legislative immunity apply to the Mayor?

Myers next argues that Barrow, as an executive official, cannot claim privilege pursuant to legislative immunity. Again, the Court disagrees.

**i.**

Barrow submits that the Mayor is not "a city or town councilman, county commissioner, county councilman" or even a "similar official by whatever name known." Md. Code Ann., Cts. & Jud. Proc. § 5-501. While the statute's text may indicate that the General Assembly intended CJ § 5-501 to have broad applicability, says Myers, its scope is not so boundless as to apply to executive officials such as a mayor. At first blush, this is an interesting argument.

The statute, to be sure, does specifically identify a series of *legislative* officials as protected individuals – "city or town councilman, county commissioner, county councilman" – and includes the residual clause "or similar official by whatever name known." Md. Code Ann., Cts. & Jud. Proc. § 5-501. Clauses like this are often interpreted in accordance with the hermeneutic canon *ejusdem generis*, that is, "where the general words in a statute, such as 'other thing of value'… follow the designation of particular things or classes of subjects, such as 'money, credit, goods, wares,' etc., the general words in the statute will usually be construed to include only those things of the same class or general nature as those specifically antecedently mentioned." *State v. Sinclair*, 274 Md. 656, 711; *see also Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001). Myers reasons that if the General Assembly had intended CJ § 5-501 to pertain to a town's mayor, it would have identified at least one *executive* officer, e.g. county executive, within the enumerated list of covered officials. Since it did not, she says, the Court may not "construe the statute with forced or subtle interpretations that limit or extend its application." *State v. Holton*, 420 Md. at 541 (*quoting Price v. State*, 378 Md. 378, 387 (2011)).

But, as Barrow points out, the Town's Charter plainly demonstrates that the Mayor of Colmar Manor has a legislative as well as an executive function and *is* in fact a member of the Town Council, the Town's legislative body. In the pertinent part, the Charter states: "All powers

13

in the Town are vested in a Town Council consisting of a Mayor and four Councilmembers…" ECF No. 11-2, Charter § 301. So, while CJ § 5-501 may not expressly pertain to all mayors in clear purely executive functions, in the present case it does apply to the Mayor of Colmar Manor because she is either a "councilmember" or – by reason of her title as Mayor – a "similar official by whatever name known." Md. Code Ann., Cts. & Jud. Proc. § 5-501. This alone is dispositive in determining that CJ § 5-501 applies to Barrow in this case.

## ii.

Even so, Myers suggests that legislative immunity does not apply because, at the time of her statements, Barrow was performing distinctly *executive* functions. ECF No. 11, p. 22. The Court rejects this characterization.

It is well established that legislative immunity "covers all those properly acting in a legislative capacity, not just actual office holders." *Kensington*, 684 F.3d at 470 (*quoting EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011).

The Supreme Court was presented with a relevant factual scenario in *Bogan v. Scott-Harris*. 523 U.S. 44 (1998). Bogan, the Mayor of the city of Fall River, Massachusetts, fired a city administrator, Scott-Harris. *Id*. at 46. Following pushback from the City Council, Scott-Harris was reinstated. *Id*. at 46-47. However, at the same time, Bogan prepared an annual budget that would eliminate Scott-Harris's position. *Id*. at 47. The City Council adopted the Mayor's budget proposal by city ordinance, and Bogan signed it into law. *Id*. Scott-Harris thereupon filed suit, alleging that the ordinance's elimination of her position violated federal law.[13] *Id*. Bogan argued that his actions were privileged by reason of legislative immunity. In evaluating whether absolute legislative

---

[13] While *Bogan* involved a claim pursuant to 42 U.S.C. § 1983, such cases "may be persuasive authority as to the Maryland common law of public official immunity in a state law." *Mandel v. O'Hara*, 576 A.2d 766, 771 (Md. 1990).

legislative immunity attached to Bogan, the Supreme Court explained that "[w]hether an act is legislative turns on the nature of the act..." *Id.* at 54. "Bogan's introduction of a budget and signing into law an ordinance," the Supreme Court found, "were formally legislative, even though he was an executive official." *Id.* at 55. These acts "were legislative because they were integral steps in the legislative process." *Id.*

Further, in *Kensington Volunteer Fire Dept., Inc. v. Montgomery County*, a collection of fire fighters accused a County Executive and his Fire Chief of eliminating part of their funding in retaliation for their vocal opposition to an "ambulance fee" that those two officials had supported. 684 F.3d 462, 465 (4th Cir. 2012). When it became clear that the ambulance fee bill would fail, the County Executive, Ike Leggett, proposed a sharp cut to the firefighter's administrative positions. The Fire Chief, Richard Bowers, had spoken in favor of the cuts during a County Council hearing on the budget. *Id.* at 466. The Montgomery County Council passed the proposed budget, excluding the ambulance fee but inclusive of the cuts, following a close, five to four vote. *Id.* When, within days, approximately twenty affected fire department employees were informed that they were terminated, *id.*, they filed suit against Executive Leggett and Chief Bowers, alleging violations of the federal and state constitutions as well as 42 U.S.C. § 1983.[14] Leggett and Bowers asserted that their actions were privileged based on legislative immunity.

After reaffirming that legislative immunity extends to "officials outside the legislative branch... when they perform legislative functions," the Fourth Circuit analyzed the relevant actions of defendants. *Id.* at 470 (*citing Bogan*, 523 U.S. at 54-55). It found that "Leggett faces trial for his actions in proposing and submitting the budget to the County Council" and "Bowers is faulted for his allegedly misleading testimony to the County Council prior to a vote on the

---

[14] *See* note 13, *supra*.

budget." *Id.* at 471. The Fourth Circuit noted that the County Executive was required by law to submit a budget and that "[s]peaking before a legislative body is… a type of legislative activity to which absolute immunity applies." *Id.* (*citing Baraka v. McGreevey*, 481 F.3d 187, 196 (3ʳᵈ Cir. 2007) ("when a governor and a governor's appointee advocate bills to the legislature, they act in a legislative capacity")). Even though "Leggett and Bowers were tasked [primarily] with executive and administrative duties," the Fourth Circuit stated that they were nonetheless sued "based on their legislative activity in proposing, submitting, and advocating for a budget." Thus both were "entitled to legislative immunity." *Id.*; *see also Mandel v. O'Hara*, 576 A.2d 766 (Md. 1990) (holding the Governor's decision whether to veto or approve legislation was protected by legislative immunity); *Church v. Montgomery County, Maryland*, 335 F. Supp. 3d 758, 770 (D. Md. 2018) (finding that "it is clear that the County Executive has a role in the legislative process mandated by state law" pertaining to county zoning plans).

Given this precedent, the Court has no trouble concluding that Barrow was exercising a legislative function at the March 20, 2018 meeting. The parties do not dispute that Barrow's proposal of the ordinance to increase the Mayor's salary was the focus of the meeting. The introduction of an ordinance, particularly one relating to the budget, is an "integral step[] in the legislative process" and a "formally legislative" act. *Bogan*, 523 U.S. 55; *see also Kensington*, 684 F.3d at 471; *Buckley v. Ray*, 848 F.3d 855, 865 (8ᵗʰ Cir. 2017) ("The decision of a legislature on how to spend public money is, in its very nature, a legislative act"). At the meeting, therefore, Barrow was performing the functions required of her by the Town Charter, namely she "participate[d]… conduct[d,] and preside[d]" over the meeting. Charter § 305(d). She opened the meeting, described its purpose and the details of the ordinance at issue, coordinated citizens seeking to ask questions, and then, along with the Councilmembers, responded to those questions.

*See generally* YouTube. Not surprisingly, since it was her proposal, Barrow advocated for the ordinance, both in her opening description and while responding to citizens' questions and comments. *Id.* Both holding hearings and stating views are vital "to enlighten the electorate and affect future legislation" and "cannot be dismissed cynically as a mere device... to woo votes." Robert J. Reinstein & Harvey A. Silverglate, *Legislative Privilege and The Separation of Powers*, 86 Harv. L. Rev. 1113, 1150-51 (1973). Barrow's actions, required by the Town's laws, and her speech before the Town Council, a protected "type of legislative activity," are clearly "entitled to legislative immunity." *Kensington*, 684 F.3d at 471.

There is no apparent policy reason – indeed it would be extremely illogical – if the Mayor were potentially liable for her statements at the meeting but if a Councilmember about to vote on the same ordinance,[15] sitting at the same table, and responding to the same questions made the same statements, the Councilmember would be immune from all liability. *See Supreme Court of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 733-34 (1990) (holding that the Virginia Supreme Court was immune from suit for enacting the State Bar Code where there was "little doubt that if the Virginia Legislature had enacted the [Code] and if suit had been brought... [it] could successfully have sought dismissal on the grounds of absolute legislative immunity"); *Mandel*, 576 A.2d at 781 ("The discretion exercised by a Governor in deciding whether to veto or approve legislation does not differ from that to be exercised by legislators in deciding whether to vote for or against a bill. There is no policy reason why legislators should enjoy absolute immunity for their legislative acts but that a Governor should have only a qualified immunity for his or her legislative function of vetoing or approving legislation.").

---

[15] Pursuant to the Town Charter the Mayor votes on each ordinance. *See* Charter § 305(d). Like each of its strictly legislative members, "the yea and nay vote of the Mayor and each Councilmember shall be recorded... [in a] journal record of the votes. Charter § 305(a).

The role of the Mayor of Colmar Manor as a member of the Town Council leaves little doubt that Barrow in fact enjoys the benefit of CJ § 5-501. Moreover, because she was performing legislative functions at the meeting when she made the allegedly defamatory statements, common law legislative immunity also applies.

### C. Are Barrow's specific statements within the sphere of legitimate legislative activity?

Myers asserts that, even if CJ § 5-501 and common law legislative immunity are generally applicable to Barrow with respect to the March 20, 2018 meeting, Barrow's specific, allegedly defamatory statements fall outside the zone of speech protected by the immunities. She suggests that the entire meeting was a gratuitous, self-promotion intended to highlight Barrow's administrative abilities in the leadup to the next mayoral election, not in fact a proceeding legislative in nature. *See* ECF No. 46, pp. 40-41.

### i.

It has long been held that "[a]bsolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan*, 523 U.S. at 54 (citing *Brandhove*, 341 U.S. at 376). That sphere is broad and courts aptly protect its integrity. "Legislative immunity's practical import is difficult to overstate." *EEOC v. Washington Suburban Sanitary Com'n*, 631 F.3d 174, 181 (4th Cir. 2011). As the Fourth Circuit explained:

> As members of the most representative branch, legislators bear significant responsibility for many of our toughest decisions, from the content of the laws that will shape our society to the size, structure, and staffing of the executive and administrative bodies carrying them out. Legislative immunity provides legislators with the breathing room necessary to make these choices in the public's interest, in a way uninhibited by judicial interference and undistorted by the fear of personal liability. It allows them to focus on their public duties by removing the costs and distractions attending lawsuits. It shields them from political wars of attrition in which their opponents try to defeat them through litigation rather than at the ballot box. And it increases the caliber of our elected officials by preventing the threat of liability from significantly deterring service, particularly in local government,

where prestige and pecuniary rewards may pale in comparison to the threat of civil liability. Legislative immunity thus reinforces representative democracy, fostering public decisionmaking by public servants for the right reasons.

*Id.* (*citing Bogan*, 523 U.S. at 52) (cleaned up).

In the seminal case of *Tenney v. Brandhove*, the Supreme Court addressed California State Senator William Brandhove's allegation that a hearing by the State Senate Fact-Finding Committee on Un-American Activities led by State Senator Jack Tenney "was not held for a legislative purpose." 341 U.S. at 371. Specifically, Brandhove suggested that the Committee in reality sought to smear a San Francisco mayoral candidate as a "Red" and, after Brandhove sought to limit funding to the Committee, it held a hearing "designed to intimidate and silence" him. *Id.* at 370-71. Tracing legislative immunity back to the English Parliament, the Articles of Confederation, and the drafting of the U.S. Constitution, the Supreme Court flatly rejected Brandhove's argument, explaining: "The claim of an unworthy purpose does not destroy the privilege." *Id.* at 377. The high court, in turn, found that the Committee was, indeed, "acting in the sphere of legitimate legislative activity." *Id.* at 376.

In *Whitener v. McWatters*, the Fourth Circuit held that legislative privilege extends to hearings allegedly intended to punish a County Board member "for expressing his minority opinions." 112 F.3d 740, 742 (4th Cir. 1997). And in *Kensington*, the Fourth Circuit looked past the plaintiffs' assertion that the termination of their jobs was in "retaliation" for their public advocacy and held that legislative immunity applied. 684 F.3d at 465.

Myers argues that the March 20, 2018 meeting was "gratuitous self-promotion" meant to emphasize her "own ability to function as an office manager" and to praise "her own improvements." ECF No. 46, p. 38-39; ECF No. 11, p. 23. The Court finds this characterization of the meeting not only strained but in any event far less compelling than the allegations presented

in *Brandhove*, *Whitener*, and *Kensington*, which found the privilege to apply. How else, the Court wonders, would Myers expect Barrow to advocate for the ordinance's adjustment of a future Mayor's duties and salary without exploring how the changes would affect what the Mayor was cable of performing? Regardless, the Court does not need to plumb Barrow's "motive or intent;" it looks only to the "nature of the act." *Bogan*, 523 U.S. at 54; *see also Brandhove*, 341 U.S. at 377 ("it [is] not consonant with our scheme of government for a court to inquire into the motives of legislators"). Barrow was performing a legislative function at the time of her statements during the March 20, 2018 meeting. Because "[t]he claim of an unworthy purpose does not destroy the privilege," Myers's assertion that the meeting was outside the "sphere of legitimate legislative activity," *Brandhove*, 341 U.S. at 376-77, is without merit.

### ii.

There remains the matter of whether Barrow's specific, allegedly defamatory words were within the sphere of legitimate legislative activity. *See Gravel v. United States*, 408 U.S. 606, 624-25 (1972); *see also United States v. Rose*, 28 F.3d 181, 188 (D.C. Cir. 1994) ("focus[ing] on the content of the speech" made before a House Committee in evaluating whether it was protected by the Speech or Debate Clause of the Constitution). The Court finds that they were.

At best, in the meeting, Barrow suggested that Myers was terminated for incompetence and that "this place [as run by Myers] was like the inmates running the asylum." YouTube (at 1:07:07 and 1:39:42); *see also* ECF No. 45-8, pp. 26-27. Barrow concedes that her comments were "a poor choice of words," ECF No. 45-8, p. 27, and perhaps they were. But she also stresses – correctly – that each remark was made in direct response to a constituent's question related to the circumstances surrounding the ordinance at issue. *Id.* The first allegedly defamatory statement came in response to the question of why there was no longer an office administrator, the person

previously responsible for the tasks that the Mayor would be additionally compensated for undertaking pursuant to the proposal. The second allegedly defamatory remark, albeit made in a somewhat circuitous manner, concerned the reason why the Mayor, as opposed, perhaps, to a part-time employee, would be better positioned to take on those tasks.

However unbecoming the remarks of the elected official, courts are generally loathe to find accusations of professional incompetence, mental instability, or worse beyond the scope of legislative privilege when made during a legislative hearing.[16] The Court of Appeals of Tennessee, for instance, held that a Councilman's statement at a City Council meeting that the former City Manager was "discharged... because of misappropriating funds and not following procedures" was protected by legislative privilege. *Miller v. Wyatt*, 457 S.W. 3d 405 (Tenn. 2014).[17] This was so despite the fact that the accusation stemmed from a history of animosity between the parties and was made during what the plaintiff claimed was a discussion of "electioneering and politics." *Id.* at 411. Similarly, the Supreme Court of Montana found that a state representative was immune from a defamation claim when, during a legislative session, he characterized as a "kook" a citizen who had spent time at a psychiatric hospital. *Cooper v. Glaser*, 228 P.3d 443 (Mont. 2010). The Supreme Court of Pennsylvania held that a Mayor's accusation during a Borough council meeting that the Chairman of the Finance Committee was "the village idiot" who had been "dipping into the till" was covered by legislative immunity. *Linder v. Mollan*, 677 A.2d 1194, 1195 (Pa. 1996). And the Fourth Circuit found one county board member's crude statement to another that "she shouldn't have let us... all sit up there and be f—ed by her" to be protected legislative speech. *Whitener*, 112 F.3d at 741, 744.

---

[16] Indeed, the privilege "has enabled reckless men to slander and even destroy others with impunity." *Brewster*, 408 U.S. at 516. *But see* note 19, *infra*.

[17] The Court acknowledges that some of the holdings discussed in this paragraph, including *Miller v. Wyatt*, are based upon state constitutions and laws not applicable to this case. Their facts and conclusions are nonetheless illuminating.

This is not to say that there may not be an outer limit to legislative privilege. Since its initial

interpretation of the Speech or Debate Clause, the Supreme Court has suggested that there may be

statements "of an extraordinary character, for which the members who take part may be held

legally responsible." *Kilbourn v. Thompson*, 103 U.S. 168, 205 (1881) (certain "utter

perversion[s]," like calling for the execution of a Justice, would not "be screened from punishment

by the constitutional provision for freedom of debate").[18] Here, however, CJ § 5-501's protection

against a "criminal action" as well as against civil complaints, such as defamation, suggests that

the General Assembly intended broad protection during a legislative meeting, even of what would

otherwise be vile violations of tort law. Md. Code Ann., Cts. & Jud. Proc. § 5-501; *compare State*

*v. Holton*, 24 A.3d 678 (Md. 2011) (dismissing criminal indictment for bribery pursuant to CJ §

5-501) *with United States v. Brewster*, 408 U.S. 501 (1972) (holding that the Speech or Debate

Clause did not prevent a Senator from being indicted for accepting a bribe pertaining to legislation

before his committee).[19]

---

[18] Several commentators have surmised that the Supreme Court chipped away at the Speech or Debate Clause in the 1970s. *See, e.g.*, Richard D. Batchelder, Jr., Note, *Chastain v. Sundquist: A Narrow Reading of the Doctrine of Legislative Immunity*, 75 Cornell L. Rev. 384, 389 (1990); *see also Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 528 (9th Cir. 1983). In *Doe v. McMillan*, the Court refused to "accept the proposition that in order to perform its legislative function Congress not only must at times consider and use actionable material but also must be free to disseminate it to the public at large, no matter how injurious to private reputation that material might be." 412 U.S. 306, 315-16 (1973) (holding privilege did not apply to Congress's publication of a D.C. school system report containing disparaging student information).

[19] Many States have interpreted associated state privileges more narrowly than established protections of the federal Speech or Debate Clause. Steven F. Huefner, *The Neglected Value of the Legislative Privilege in State Legislatures*, 45 Wm. & Mary L. Rev. 221, 259 (2003). Furthermore, some States have deemed local officials to be protected only by qualified immunity. *See, Lutz v. Nelson*, 788 N.W.2d 58 (Minn. 2010) (holding "that the people of Minnesota are better served by the application of a qualified, rather than absolute, privilege to members of watershed district boards" for allegedly defamatory statements made during a board meeting); *McClendon v. Coverdale*, 203 A.2d 815, 817 (Del. Super. Ct. 1964) (refusing to apply absolute privilege to defamatory statements made by a Newark Councilman at a City Council meeting and stating "if absolute privilege is to attach to the words of legislators of subordinate bodies, it must come from legislation"); *Mills v. Denny*, 63 N.W.2d 222, 227 (Iowa 1954) ("utterances or publications of members of a city council are not... absolutely privileged communication"); *see also* Restatement (Second) of Torts § 590 (1977), cmt. c ("Under a minority rule, the absolute privilege is held not to be applicable to these legislative members, who may be entitled instead to the conditional privilege set forth in § 598A [Inferior State Officers]"). Not so in Maryland.

The Supreme Court has theorized that "[s]elf-discipline and the voters," opposed to courts, "must be the ultimate reliance for discouraging or correcting such abuses." *Brandhove*, 341 U.S. at 378. Americans, though, have apparently not shied away from electing candidates who have openly berated their staffs and spoken obvious falsehoods about them and others. While there may yet be statements so extreme, so malicious, and so unfounded that a court could not in good conscious apply the legislative privilege conferred by common law or by CJ § 5-501, Barrow's comments about Myers on March 20, 2018 are many leagues away from that point.

The Court **GRANTS** Defendants' Motion for Summary Judgment, ECF No. 39, as it pertains to Myers's defamation claim. With this, all of Myers's claims are now disposed of. Defendants' Motion for Summary Judgment is **GRANTED** in full and Final Judgment will be **ENTERED** in favor of Defendants and against Plaintiff.

A separate Order will **ISSUE**.

/s/
_____
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

May 1, 2020